

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| JOSE JUAN SANDOVAL, | § | No. 08-11-00283-CR |
| Appellant, | § | Appeal from the |
| v. | § | 346th District Court |
| THE STATE OF TEXAS, | § | of El Paso County, Texas |
| Appellee. | § | (TC# 20100D02656) |
| | § | |

## O P I N I O N

Jose Juan Sandoval ("Sandoval" or "Appellant") appeals his conviction on three counts of criminal solicitation to commit capital murder, for which he was sentenced to thirty (30) years' confinement. In a single issue, Sandoval challenges the legal sufficiency of the evidence to support his conviction. Sandoval asserts the legal insufficiency is the result of the lack of sufficient corroboration of the accomplice witnesses' testimony under TEX.PENAL CODE ANN. § 15.03(b)(West 2011) and TEX.CODE CRIM.PROC.ANN. art. 38.14 (West 2005). For the reasons set out below, we affirm as modified.

### PROCEDURAL HISTORY

Sandoval was indicted on four counts of criminal solicitation to commit capital murder, alleged to have occurred on or about April 4, 2010, and one count of retaliation, alleged to have

occurred on or about April 3, 2010. The retaliation count was dismissed by the State, and Sandoval pled not guilty to the four remaining counts of criminal solicitation. Following a trial, the jury found Sandoval guilty of Counts I-III and not guilty of Count IV. Sandoval timely appealed.

**BACKGROUND**

Sandoval was convicted of solicitation of capital murder of Auralila Brenes ("Auralila"), Francisca Garcia (Auralila's mother), and Flavio Rosete (Auralila's neighbor). Three accomplice witnesses, Vicente Lopez ("Lopez"), Gabriel Martin ("Martin"), and Christian Renovato ("Renovato"), testified against Sandoval. Lopez, Martin, and Renovato testified pursuant to a plea agreement with the State. In exchange for their plea of guilty each to four counts of criminal conspiracy to commit capital murder and one count of engaging in organized criminal activity, they would each be sentenced to 10 years' imprisonment.

Flavio Rosete ("Rosete") lived next door to Auralila on Mike Godwin Street in El Paso, Texas. Rosete had met Sandoval only once, as Auralila had introduced him to Sandoval at her house ("the Mike Godwin house"). In January of 2010, Rosete heard shots being fired outside of his house at about ten or eleven o'clock at night. Rosete looked outside through his window and saw Sandoval outside of Auralila's house. Rosete did not see Sandoval with a gun.

On Easter Sunday, April 4, 2010, Rosete, his wife, and Auralila's mother and aunt, were helping Auralila move and loading her furniture into a Budget moving truck. Rosete understood Auralila was moving to New Mexico. Rosete agreed to drive the Budget truck for her. Meanwhile, that same Sunday afternoon, Lopez, leader of the "Skunx" gang, went to the house of Daniel Dalli ("Dalli") to buy marijuana. Dalli asked Lopez if he "wanted to make some money."

2

Dalli told Lopez all he "would have to do is go check on a girl . . . see what she was doing."[1]   Dalli told Lopez she lived just a few blocks away.   Lopez agreed.   Dalli then gave Lopez a phone number to call, which Lopez understood belonged to Sandoval.[2]   Dalli lives on Willowmist which is a few blocks from Mike Godwin.

Lopez called Sandoval for the first time at 5:24 p.m. and spoke to him for four minutes and nine seconds.   Sandoval offered Lopez $200 to "just go check" on Auralila.   Sandoval asked Lopez to see if "she was with anybody or what she was doing."   Dalli told Lopez to go to Mike Godwin and there would be a Budget truck in front of the house where Auralila lived.   Lopez was driving a baby blue 1994 Buick Sentra.

Lopez drove down Mike Godwin and observed a group of people moving a safe into the back of a truck.   He stopped to ask a girl, fitting Sandoval's description, "if she had work or needed help with anything."   Auralila told Lopez no.   Lopez called Sandoval back and told him there is a male there and they were moving stuff out.   Sandoval offered Lopez $500 to follow Auralila and find out where she was moving to.   Lopez agreed to do it.

Lopez saw Auralila get into a Land Cruiser and he followed it.   The Land Cruiser was following the Budget truck.   After a block, Lopez lost the Land Cruiser and suspected she had seen him.   Lopez backtracked and was able to find the Budget truck.   Lopez began following the truck to northeast El Paso.   According to Lopez, Rosete tried to hit Lopez' car with the Budget truck, so he left the area and reported to Sandoval he had been spotted.   Lopez described the

---

[1]  Though Lopez did not know the identity of the "girl," it was undisputed that the woman identified by him as "the girl" is Auralila Brenes.   Lopez testified he did not know the exact relationship between Auralila and Sandoval but assumed she was Sandoval's girlfriend.

[2]  During the relevant time period, Lopez' cell phone number was 915-234-3889.   The evidence is Sandoval was using cell phone number 915-261-3109.

truck's driver to Sandoval. Sandoval told Lopez the truck's driver is Auralila's neighbor[3] and not to worry about him. Sandoval instructed Lopez to go back to the Budget truck and "find out where he is going."

Lopez located the Budget truck parked a few blocks away from where he last seen it. Lopez got out of his car with his knife but Rosete took off "before [he] even got close." Lopez got back into his car and began to follow the truck again.

As Rosete was driving the Budget truck, Auralila's son saw they were being followed by a blue car. Rosete parked the truck and went to "see who they were." However, the blue car drove away.[4] Rosete proceeded on his way and the blue car began following them again. At one point, Rosete stopped at a store to wait for Auralila. The blue car also stopped and Lopez got out. Rosete saw Lopez come "directly to the truck on the passenger side," so Rosete immediately started the truck and left. Rosete called the police.

As Lopez was following the Budget truck, the Land Cruiser reappeared. Lopez believed photos or video had been taken of him so he attempted to stop the Land Cruiser to "get the camera." He followed the Land Cruiser to a restaurant. The Budget truck tried to block the street on which Lopez was driving. Lopez called Sandoval to tell him "everything that had happened" and "[he] needed to get out of there" because "[t]hey had cameras."

Sandoval got "really mad" and told Lopez "inside the safe that there was money, and that there was coke inside of it" worth around $250,000. Sandoval told Lopez that he "can't lose that truck." Sandoval ordered Lopez to follow them and "find out where they are going." Lopez told Sandoval he was running out of gas and needed money. Sandoval told him "[g]o back to Dalli's,

---

[3] It was undisputed the neighbor Sandoval was referring to was Rosete.

[4] At trial, Rosete identified photographs of the car that followed him, which was identified as Lopez' vehicle.

4

and he will give you the money." Lopez then called several other Skunx gang members to help him. Lopez arranged to meet Gabriel Martin, Christian Renovato, and Brandon Jordan at a local Whataburger.

After meeting with Martin, Renovato, and Jordan, Lopez called Sandoval back at about "6:00, 7:00 or maybe eight o'clock." Sandoval, according to Lopez, offered to pay $10,000 to kidnap Auralila and kill her mother by chopping off her head. Sandoval told Lopez "she was cheating on him; that she was a big old slut" and "he had just gotten her implants and that she was still cheating on him." Sandoval also said, "the mother [is] a witch; that she had put a hex on him" and that was why "he wanted her head chopped off." Sandoval also offered Lopez a $95,000 table, and anything left in the house after they picked Auralila up. Sandoval, according to Lopez, explained "he wasn't able to handle the situation; that he was in Chicago, and he wouldn't be back until Tuesday." However, Sandoval specifically instructed Lopez, "not to do it in front of her little girl." Sandoval is adamant that "nobody [is] to touch her . . . not to hit her, not to sexual assault her, nothing of that sort." Sandoval told Lopez that he "wanted her nice and safe for when he got back." After kidnapping Auralila, Lopez was to prove to Sandoval they had her by calling Sandoval with Auralila's cell phone. Sandoval told Lopez after they kidnapped Auralila, "to put her into a hotel until Tuesday to keep her safe." Eventually, Sandoval offered Lopez $40,000 to $50,000 to kidnap Auralila so Sandoval could kill her and Lopez was to kill Auralila's mother.

Lopez told Sandoval he needed money for gas, supplies, and to pay for a hotel. Sandoval sent Lopez to Dalli's for $500 to use as "expense money." Sandoval promised to pay the rest later. Dalli gave Lopez $400 and a .32 caliber handgun with ammunition.[5] Lopez, Martin, Renovato, and Jordan went to a Wal-Mart in northeast El Paso to get supplies. They bought

---

[5] Lopez stated he only took $400, leaving the remaining $100 with Dalli for future expenses.

gloves, black shirts, bandanas, a baseball bat, and a machete. All four are recorded on the store's security cameras making these purchases at about eleven o'clock on April 4. Lopez testified the machete was "for the mother" and the gloves to "keep our hands clean." Lopez unequivocally stated he was prepared to use the machete to chop off Auralila's mother's head. The prosecutor asked Lopez why was he doing this and he replied "Money."

Lopez, Martin, Renovato, and Jordan then began to search for the Budget truck but were unsuccessful. Lopez called Sandoval, who instructed them to "go back to the house and see if they have gone over there." When they arrived at the Mike Godwin house, there were no lights on and nobody was there. Lopez called Sandoval again, who told them "to break into the house." With Lopez and Martin acting as lookouts, Renovato and Jordan broke into the house through a back door. They found the Land Cruiser in the garage. Lopez called Sandoval to report "they had been there" but "we just lost them." Sandoval became "really aggravated . . . annoyed . . . [and] . . . mad," speaking to Lopez completely in Spanish. Sandoval ordered them to check a house on Mercury Street in northeast El Paso. Lopez and his friends went to that address, but did not find anyone there. After Lopez informed Sandoval of their progress, Sandoval instructed them to go back to the Mike Godwin house.

Back at the Mike Godwin house, sometime after two in the morning, they entered the house again. The Land Cruiser was gone, but they found pictures of Auralila and her mother, which they took along with a cell phone, a T.V., and a gaming device. According to Lopez, they took the pictures in order to have a "description of her" and "know who she was." Lopez saw the large marble and gold table Sandoval had offered him. Martin testified Sandoval wanted them to look in Auralila's bedroom for men's clothing.

6

Lopez and his friends went to another Wal-Mart to purchase additional supplies. The store's security cameras recorded them making these purchases on April 5 at 4:07 a.m. All four returned to the Mike Godwin house and remained there until approximately 6 a.m. and then they returned to their own individual residences. Lopez went to sleep around 8 or 9 that morning.

Sandoval had told Lopez, the night before, Rosete "would know where she was at" and "to go break into the house to see what he would know." Sandoval told Lopez, Rosete took his daughter to school at 7 a.m. and returned home before going to work at about 8 a.m. at a maquila[6] in Juarez. Sandoval directed Lopez to do "whatever needs to be done" in order to get him to talk and tell them Auralila's whereabouts. According to Lopez, he and Martin discussed what to do if they "had to go in" after Rosete. Lopez stated, "we were talking about just breaking his fingers and maybe cutting them off to get the information that we wanted if he didn't want to tell us." Lopez said Martin told him "that since [Lopez] was going to take care of the mother, [Martin] will take care of the neighbor."

Lopez woke Martin up around 11 a.m. or noon. They went back to Mike Godwin, and found "nothing was going on." They decided to keep "cruising around," to look for the Budget truck and visit with Dalli. Later, they met Renovato and Jordan at the Mike Godwin house.

Lopez stated he and Martin went "to the neighbor's house to see if he was home." Lopez explained, "we went and we knocked. And nobody came to the door. We could tell because the door had a glass window on it." No one answered the door. Lopez and Martin stood at the door "waiting for something to happen."

Martin testified Sandoval instructed them to contact Rosete by knocking on his door and

---

[6] A maquiladora ("maquila") is a factory run by a U.S. company in Mexico . . . . WEBSTER'S NEW UNIVERSAL UNABRIDGED DICTIONARY 1173 (2001).

take him hostage.   If Rosete's daughter was also there, they were to take her hostage as well. Martin testified he and Lopez did as Sandoval instructed and knocked on Rosete's front door.   No one answered, so they left.

On the morning of April 5, Rosete saw the same blue car driving by "the front of my house."   After Rosete saw the blue car, he did not want to go inside his house.   Later that afternoon, he saw the blue car again on the street at his house.   He observed two males approach his house and knock on the door.   Rosete states they were "the same guys from the blue car." Rosete did not answer the door because his wife was scared and his two young daughters were at home.   Afterwards, Rosete left his home to go buy a handgun because he felt he needed to protect his family.   When he returned home with his newly purchased gun, there were numerous police officers at Auralila's house.   Rosete never saw the men or the blue car again.   At that time, Rosete testified he was working at a maquiladora.

Martin testified that they decided to call Sandoval and tell him they had taken a cell phone from the Mike Godwin house.   The names and numbers on the cell phone were given to Sandoval by Renovato.   Renovato testified that Sandoval, whom he only knew as "Jose" from the prior evening,[7] was "just crazy."   Renovato stated Sandoval swore extensively when he was told the names listed in the cell phone and learned his name was not included.   Sandoval became "extra mad" when he heard the name "Raul."   According to Lopez, Sandoval said "Raul" was one of the men Auralila "was messing around with."

Jordan and Lopez went back to Northeast El Paso, while Martin and Renovato stayed and watched the Mike Godwin house.   At around 8 p.m., Lopez told Martin and Renovato to break

---

[7] Renovato testified that Lopez was on the phone all night with a guy named "Jose," who was the man who kept telling Lopez what he wanted done, how he wanted it done, and when he wanted it done.

8

into the Mike Godwin house again. Lopez told them to search the house for items like an ID or passport, so Auralila would not be able to leave the country. Martin and Renovato entered the house and began searching. Renovato testified that as they searched, he was carrying the bat while Martin had the machete.

On April 5, at about 7:45 p.m., El Paso Police Officer Shawn Richardson was dispatched to a house on Mike Godwin Street. After waiting for back-up, the officers proceeded towards the house and "saw two subjects exiting the back of the house." As the officers approached them "they took off running." The officers pursued both individuals. During the chase, each subject discarded an item, both of which were later recovered. The recovered items were a baseball bat and a machete.

Martin was arrested on April 5, near Edgemere and Mike Godwin, after he ran from the home. Initially, Martin told police that "we were breaking into a house." Martin testified Sandoval wants "us to go back into the house to see if the girl has been in there and see if anything has been moved." Martin explained that he and Renovato went back into the house but a cop saw them and they took off running. As they are running, Martin and Renovato "get rid of everything."

Renovato eluded the police. He called Lopez and told him Martin had been caught. Lopez picked up Renovato and returned the gun to Dalli.

Lopez called Sandoval to tell him what happened. Lopez testified Sandoval knew "the cops had already shown up." Lopez spoke to Sandoval once or twice more. Lopez told Sandoval, he "wasn't going to be able to do it; that they had already caught one of my guys . . . ." Sandoval was aggravated and told Lopez, "I knew I should have never gotten involved with you

guys, and you guys couldn't even handle this one little thing." Sandoval kept calling Lopez, but Lopez turned his phone off and the next day changed his number. Lopez was arrested a couple days later due to outstanding traffic warrants.

Martin testified "we were supposed to pick up . . . a lady and her mom," then hold Auralila and kill her mom by chopping off her head. After they were unable to locate Auralila and her mom, the plan was to question Rosete to see if he could help them find her. If he could not help, they were going to kill him as well.

Renovato was arrested the following Friday. In Renovato's initial statement, he claimed to know little of what was going on. He stated he did not know why Lopez was following Auralila or why Lopez was supposed to pick her up.

After Sandoval's arrest, police searched the car he was driving and found a manila envelope which contained various documents addressed to Sandoval at 3213 Tierra Ave Pl. El Paso, Texas 79938. The documents addressed to Sandoval include:

(1)     letters regarding his mortgage for 3213 Tierra Ave. Pl.;

(2)     Wells Fargo Bank Statements for his savings account;

(3)     correspondence from the Municipal Court of the City of El Paso;

(4)     April 2, 2010, ATT cell phone bill advising of the immediate suspension if the bill is not paid;

(5)     March 30, 2010 letter for Verizon Wireless to collect account balance of $986.32;

(6)     Chase Bank Checking Account statement for March addressed to Juan Sandoval DBA Vagos Trucking;

(7)     Notice from Texas Department of Public Safety advising Sandoval his driver license may be suspended for failure to pay a surcharge fee;

(8)     Collection letter regarding a Target account;

(9)     Letter from Landstar advising Sandoval that in processing his fuel and miles, the gallons reported did not match the fuel receipt submitted dated March 29, 2010;

(10)    Blank forms from Landstar Transportation Logistics, Inc. which include information to be completed regarding "state . . . miles . . . highways traveled;"

(11)    Completed form for Landstar Carrier Services, driver: Juan Sandoval, 3-17-2010, El Paso, Texas; 3-19-2010 El Paso, Texas; 3-21-2010 Kentwood MI, and the states listed as TX, AR, MO, IL, IN, MI;

(12)    A form from LANDSTAR CARRIER GROUP, to be completed when scanning documents and replaces the trip envelope, trailer number 655004, Origin City El Paso, TX; Destination City Kentwood, MI; Owner Name Juan Sandoval;

(13)    A form from LANDSTAR CARRIER GROUP, to be completed when scanning documents and replaces the trip envelope, trailer number 655004, Origin City Kentwood, MI; Destination City El Paso, TX; Owner Name Juan Sandoval;

(14)    Fuel receipt Petro Travel Center #301, 1925 Horizon Blvd, El Paso, Texas Saturday April 3, 2010, Company Name LANDSTAR, purchase diesel fuel 243.012 gallons for $721.50;

(15)    Fuel receipt Love's Travel Stops Store 313, **Matthews, Missouri** on **April 4, 2010**, for purchase of diesel, Pump 24 and 100.350 gallons for a total price of $304.96, trucking company: LANDSTAR;

(16)    Pilot Travel Center Receipt, **Gary, Indiana**, **April 5, 2010**, for truck diesel purchase of 177.025 gallons $527.36, company LANDSTAR;

(17)    Completed form for Landstar Carrier Services, driver: Juan Sandoval, 3-31-2010, El Paso, Texas; 4-2-2010 El Paso, Texas; 4-4-2010 Kentwood MI, and the states listed as TX, AR, MO, IL, IN, MI. Total Miles 1745;

(18)    Completed form for Landstar Carrier Services, driver: Juan Sandoval, 4-4-2010, Kentwood, MI; 4-4-2010 Kentwood, MI; 4-6-2010 El Paso, TX, and the states listed as MI, IN, IL, MO, AR. TX. Total Miles 1745;

(19)    A "SHIPPER" form which reflects ship to: Lacks, 4080 Barden Dr.,

11

Kentwood, MI 49512 and trailer comments: T. SOTO LANDSTAR.

There were also, two letters dated February 11, 2010 and February 24, 2010 addressed to Auralila Brenes, 3213 Tierra Ave Pl. El Paso, Texas 79938. Each letter to Auralila is from the Aaronson Law firm regarding the disposition of two traffic tickets she had received.

At trial, Terrence O'Connor ("O'Connor"), an associate professor in the electrical and computer engineering technology department of Purdue University, testified as an expert consultant who analyzed the cell phone evidence. O'Connor was provided with cell phone records pertaining to phone numbers 915-261-3109 (belonging to or in the possession of Sandoval) and registered in the name of Auralina Brene. He was also provided with the cell phone records of 915-234-3889 (belonging to Lopez). O'Connor was able to plot which cell phone tower antennas were being used when cell phone number "3109" was communicating with cell phone number "3889," and a report of this analysis was entered into evidence at the trial. The cell phone records of "3109" indicate it was with ATT, prepaid, and activated on April 3, 2010.

The cell phone records reflected the first call made from Lopez to Sandoval's cell phone was at 5:24 pm on April 4, 2010, and no previous calls had been made between these numbers. At the time of this first call, Sandoval's cell phone was in Arkansas. O'Connor testified that Sandoval's cell phone continued in a north-easterly path toward Michigan. O'Connor analyzed the frequency of the calls between the phones and noted that the periods of time between the calls varied from being as short as a few seconds, with the longest break being about an hour and twenty minutes. The average call duration between calls was approximately twenty minutes. O'Connor determined that Sandoval's cell phone was moving between 60 and 80 mph.

O'Connor characterized the communications between the cell phones as "frantic," due to

12

the duration and extremely high frequency of the calls that continued over two days.[8]   O'Connor noted that the user of Sandoval's cell phone could not have slept more than forty minutes during the night of April 4 and that, even though there was a stop at the Gerald R. Ford International Airport for approximately six hours, Sandoval's cell phone was in constant use with the longest duration between calls being forty minutes.   The last incoming call from Lopez' cell phone to Sandoval's cell phone was on April 5, 2010 at 8:26 pm.   On April 6, 2010, there were calls from Sandoval's cell phone to Lopez' cell phone, but no connection.   O'Connor acknowledged that there was no way to tell who was talking on the phones or what was being said.

The cell phone records of "3109" reflected two stops or pauses where the phone either slowed or stopped its movement.   The timing of a stop on **April 5** was consistent with the fuel receipt from a truck stop in *Gary, Indiana*.   The timing of a second stop was also consistent with a fuel receipt from a truck stop in *Matthews, Missouri* on **April 4**.   Further, they show that "3109" made or received approximately 290 calls or attempted calls from April 4, 2010 through April 5, 2010 from cell phone number "3889," Lopez' cell phone.

Daniel Dalli had an account with Sprint for a cell phone assigned the number of 915-861-5898.   Sandoval's cell phone records reflect the user of "3109" first called the user of "5898" April 3, 2010, 1:16 p.m.   The "3109" cell phone records reflect that approximately 141 calls were placed between these two numbers from the initial call on April 3 until the last call on April 6, 2010 at 9:09 p.m.

### In Jail

Lopez and Sandoval met in person for the first time in the El Paso County Jail.   Lopez and

---

[8] There were approximately 1,000 calls made from Sandoval's cell phone on April 4 and 5, 2010, and approximately 600 calls made from Lopez' cell phone during the same time.

13

Sandoval were seated in the back of a courtroom next to each other. Lopez recognized Sandoval from the photo he had been shown by police officers after his arrest. In the courtroom, Sandoval was identified as Juan Sandoval which confirmed his identity to Lopez. Sandoval instructed Lopez not to say anything; to change Lopez' statement and that Lopez' statement was the most incriminating statement. Sandoval told Lopez to change his statement and say that Lopez "made up the story." Sandoval promised Lopez if he changes his statement, the State would drop the case and only a burglary charge would remain. Lopez initially agrees to change his story, but only after speaking with Lopez' attorney. Sandoval insisted his lawyer would take care of that for Lopez.

Martin also met Sandoval in the El Paso County Jail. Sandoval told Martin that they were "just supposed to be following the girl and that's it." Sandoval also told Martin not to say "that we are going to go kill everybody, that we should just have been quiet." Sandoval urged Martin not to take the plea agreement offered by the State.

Renovato also met with Sandoval when they were assigned to the same cell block.[9] Renovato was also shown a picture of Sandoval by police officers after his arrest. Sandoval later contacted Renovato and told him the charges would likely be dropped if Renovato wrote a letter. Sandoval instructed Renovato to state there was a misunderstanding about what was supposed to happen. Renovato wrote the letter while Sandoval and Renovato were confined to the same "tank" of the El Paso Jail. Sandoval instructed Renovato that after he wrote it, to give it to him. Renovato gave the letter to Sandoval. During cross-examination of Renovato at trial, a letter written and signed by Renovato was offered by the defense and admitted into evidence. The letter

---

[9] An El Paso Sheriff's Deputy testified that jail records reflected that Renovato and Sandoval were housed in the same jail pod from July 28 to August 3, 2010, with Renovato in Cell 1207 and Sandoval in Cell 1209.

stated that everything is "a lie."  Renovato wrote the letter while Sandoval and Renovato were confined to the same "tank" of the El Paso Jail.  Sandoval encouraged Renovato to have Lopez, Martin, and Jordan write similar letters.

## DISCUSSION

In his sole issue, Sandoval challenges the legal sufficiency of the evidence to support his conviction.  Sandoval argues that the majority of the evidence in the case came from accomplice witnesses, whose testimony must both be strongly corroborated and whose testimony cannot be used to corroborate each other's testimony.  Sandoval further argues that there is insufficient non-accomplice witness testimony to corroborate the accomplice-witness testimony.  Sandoval argues that as a result, the State failed to prove that Sandoval committed the offenses beyond a reasonable doubt, and that the judgment should be set aside and an acquittal rendered.

Essentially, Sandoval raises two distinct legal theories in his argument:  (1) the evidence was legally insufficient thereby depriving Appellant of his due process rights under the U.S. and Texas Constitutions; and (2) the conviction cannot be sustained under TEX.PENAL CODE ANN. § 15.03(a), (b) and Texas Code of Criminal Procedure Article 38.14.  We will address each of these theories separately.  *See Cathey v. State*, 992 S.W.2d 460, 462 (Tex.Crim.App. 1999), *cert. denied*, 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)(expressly distinguishing legal and factual sufficiency standards from the accomplice-witness standard of review under Article 38.14).

### Accomplice Witness Testimony for Criminal Solicitation

A person commits criminal solicitation if "with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in

15

specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission." TEX.PENAL CODE ANN. § 15.03(a)(West 2011). Thus, the State must prove that Sandoval: (1) with intent that a capital felony be committed; (2) requested, commanded, or attempted to induce Vicente Lopez; (3) to engage in specific conduct, that is (a) to deliver Auralila Brenes to Sandoval so he could kill her, (b) kill Francisca Garcia, (c) kill Flavio Rosete; and (4) that under the circumstances surrounding the conduct of Vicente Lopez as Sandoval believed them to be would have made Vicente Lopez a party to capital murder. Once Sandoval, with the intent that a capital murder be committed, acted to induce Lopez to engage in the conduct to commit the capital murder, the criminal solicitation offense has been committed. *Whatley v. State,* 946 S.W.2d 73, 79 (Tex.Crim.App. 1997); *Majid v. State*, 713 S.W.2d 405, 407-08 (Tex.App.--El Paso 1986, pet. ref'd).

The statute that directly governs testimony by an accomplice witness in a criminal-solicitation offense is TEX.PENAL CODE ANN. § 15.03(b). Pursuant to Section 15.03(b), "[a] person may not be convicted [of criminal solicitation] on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation." TEX.PENAL CODE ANN. § 15.03(b). Further, Article 38.14 of the Texas Code of Criminal Procedure provides "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."[10] TEX.CODE CRIM.PROC.ANN. art. 38.14 (West 2005). The corroboration requirement

---

[10] Corroborating evidence is "incriminating" evidence that does not come from an accomplice witness. *See Claxton*, 124 S.W.3d at 765.

of Section 15.03(b) embodies the same concept and is equivalent to Article 38.14. *Richardson v. State,* 700 S.W.2d 591, 594 (Tex.Crim.App. 1985)(en banc); *see also Claxton v. State,* 124 S.W.3d 761, 765 (Tex.App.--Houston [1st Dist.] 2003, pet. ref'd).

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we eliminate the accomplice testimony from consideration and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime. *Malone v. State*, 253 S.W.3d 253, 257 (Tex.Crim.App. 2008). The sufficiency of non-accomplice evidence is judged according to the particular facts and circumstances of each case. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim.App. 1988). The direct or circumstantial non-accomplice evidence is sufficient corroboration if it shows that rational jurors could have found that it sufficiently tended to connect the accused to the offense. *Simmons v. State*, 282 S.W.3d 504, 508 (Tex.Crim.App. 2009); *Reed*, 744 S.W.2d at 126. When there are conflicting views of the evidence—one that tends to connect the accused to the offense and one that does not—we will defer to the fact finder's resolution of the evidence. *Smith v. State*, 332 S.W.3d 425, 442 (Tex.Crim.App. 2011); *Simmons*, 282 S.W.3d at 508. It is not appropriate for appellate courts to independently construe the non-accomplice evidence. *Smith*, 332 S.W.3d at 442; *Simmons*, 282 S.W.3d at 509.

Corroborating evidence that shows only that the offense was committed is not sufficient. TEX.CODE CRIM.PROC.ANN. arts. 38.14, 38.141(b); *Castillo v. State*, 221 S.W.3d 689, 691 (Tex.Crim.App. 2007). Yet, the corroborating, i.e., non-accomplice, evidence need not be sufficient, by itself, to establish that the accused is guilty beyond a reasonable doubt. *Castillo*, 221 S.W.3d at 691. Likewise, the corroborating evidence need not directly link the accused to the

offense. *Castillo*, 221 S.W.3d at 691. Circumstances that appear insignificant may constitute sufficient evidence of corroboration. *Malone*, 253 S.W.3d at 257. Motive and opportunity evidence is insufficient on its own to corroborate accomplice-witness testimony, but both may be considered in connection with other evidence that tends to connect the accused to the crime.[11] *Reed*, 744 S.W.2d at 127; *Guevara v. State*, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004)(stating that "[m]otive is a significant circumstance indicating guilt" when analyzing the legal sufficiency of the evidence); *cf. Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim.App. 1994)(defendant's secretive actions after the offense used as a corroborating circumstance); *Cawley v. State*, 166 Tex.Crim. 37, 310 S.W.2d 340, 342 (1957)(evidence of flight is a corroborating circumstance because it is indicative of a consciousness of guilt).

## Corroboration of Accomplice-Witness

We will first examine the non-accomplice testimony which tends to connect Sandoval to the alleged offense. Sandoval contends that there is insufficient evidence to corroborate the accomplice witness testimony. As noted above, Article 38.14 provides that a conviction cannot stand on accomplice testimony unless there is other evidence tending to connect the defendant to the offense, but the non-accomplice evidence need not be sufficient, in itself, to support a conviction, and the accomplice witness rule is not governed by federal or state constitutional standard. *Castillo*, 221 S.W.3d at 691; *Cathey*, 992 S.W.2d at 462.

The non-accomplice evidence is as follows:

---

[11] Similarly:

> [P]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction.

*Richardson v. State*, 879 S.W.2d 874, 880 (Tex.Crim.App. 1993), *quoting Brown v. State*, 672 S.W.2d 487, 489 (Tex.Crim.App. 1984).

18

(1)      Cell phone records introduced at trial showed:   (1) prior to April 4 there had been no calls on either phone ("3889" or "3109") between Lopez and Sandoval; the first call made between these phones was the early evening of April 4, 2010; when the first call was made, Sandoval's cell phone was in Arkansas and continued in a north-easterly path toward Michigan, moving at 60 to 80 mph.   The cell phone records reflected two stops or pauses where the phone either slowed or stopped its movement, one consistent with a fuel stop on **April 5** in *Gary, Indiana*, the other with a fuel stop in *Matthews, Missouri* on **April 4**.   The user of Sandoval's cell phone could not have slept more than forty minutes during the night of April 4 and Sandoval's cell phone was in constant use; the last incoming call from Lopez' cell phone to Sandoval's cell phone was on April 5, 2010 at 8:26 pm.   On April 6, 2010, there were calls from Sandoval's cell phone to Lopez' cell phone, but no connection; and there were approximately one thousand calls made from Sandoval's cell phone on April 4 and 5, 2010, and approximately 600 calls made from Lopez' cell phone during the same time.   Cell phone records of Sandoval and Lopez corroborate Lopez' testimony regarding the calls between them.

(2)      Incident to Sandoval's arrest, police conducted an inventory of the car he was driving and located a manila envelope.   The envelope contained a number of documents which included two Landstar packets.   One packet reflected a trip by Sandoval on April 4 from El Paso to Kentwood, Michigan and contained a receipt for fuel obtained in *Matthews, Missouri* on **April 4**.   The second showed a return trip by Sandoval on April 4 from Kentwood, Michigan to El Paso and contained a fuel receipt from *Gary, Indiana,* on **April 5**.   These two receipts location, date, and time coincided exactly with the expert's triangulation of calls from Sandoval's cell phone.   These receipts also corroborate Lopez' testimony that Sandoval was out of town.

(3)      The cell phone Sandoval used was registered in the name of Auralina Brene and had been opened on April 3, 2010.   Correspondence from Auralila's attorney was received at Sandoval's residence addressed to Auralila Brenes.   This corroborates Lopez and Rosete's testimony of a connection between Sandoval and Auralila.

(4)      Auralila had introduced Sandoval to Rosete at her house.   Rosete had last seen Sandoval at Auralila's house in January 2010, three to four months prior to her moving on April 4.   Rosete corroborates Lopez' testimony that Rosete was driving the Budget truck and he is Auralila's neighbor.   Rosete corroborates Lopez that Rosete was working at a maquiladora in April 2010.   Rosete corroborates Lopez' testimony regarding the chase by Lopez' blue car; that Lopez got out and approached the truck and Rosete took off.   Further, Rosete corroborates Lopez and Martin's effort to speak with him at his house on Monday, April 5.

(5)      The two security videos from Wal-Mart showing Lopez, Martin, and Renovato buying supplies on two separate occasions, to include a bat and a machete.   Lopez' purchase of the machete supports his testimony that Sandoval wanted Auralila's mother killed by

19

having her head chopped off.

(6)     El Paso Sheriff Department records indicate that Renovato and Sandoval were housed in the same jail pod from July 28 to August 3, 2010. This evidence corroborates Renovato's testimony regarding Sandoval's efforts to get him and other accomplice witnesses to change their statements. Renovato's letter written in jail and given to Sandoval corroborates Renovato's testimony and Sandoval's conduct.

(7)     Lopez' testimony is corroborated by evidence:
            (a) that Dalli does in fact live on Willowmist;
            (b) Dalli's house on Willowmist is a few blocks from Auralila's house on Godwin;
            (c) the cell phone number Dalli gave Lopez and identified by Lopez as Sandoval's phone number is connected to the defendant through the expert's testimony and the trip receipts;
            (d) from April 3 through April 6, Dalli's cell phone number and Sandoval's number make contact or attempt to make contact approximately 141 times.

(8)     The lack of a motive and/or relationship between accomplice-witnesses Lopez, Martin, and Renovato to Auralila, her mother, or Rosete.

(9)     The fact that Lopez, Martin, and Renovato pled guilty to criminal conspiracy to commit capital murder and engaging in organized criminal activity in exchange for a sentence of 10-years' imprisonment.

(10)    According to Lopez, Sandoval told him Rosete worked at a maquila. Rosete testified, that at the time, he worked at a maquila. Lopez also testified to Sandoval directing them to take Rosete's daughter as a hostage. Rosete testified he has two daughters. Lopez' testimony is corroborated by Rosete.

(11)    Sandoval's introduction into evidence Renovato's letter that attempted to exonerate Sandoval corroborates Renovato's testimony surrounding the circumstances of the letter.

(12)    The accomplice-witnesses identify the individual directing them on the cell phone as Jose Sandoval. The defendant's name is Jose Juan Sandoval. This corroborates their testimony.

We find that rational jurors could find sufficient evidence to connect Sandoval with the offense.

**Legal Sufficiency**

20

In *Brooks v. State*, the Court of Criminal Appeals abandoned factual sufficiency review in those cases where the burden of proof is beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 894-95 (Tex.Crim.App. 2010)(finding no meaningful distinction between the legal and factual sufficiency standards and no justification for retaining both standards, therefore overruling the factual sufficiency review adopted in *Clewis v. State*, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996)). The legal sufficiency standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), is the only standard a reviewing court applies in determining whether the evidence is sufficient to support a conviction. *Brooks*, 323 S.W.3d at 894-95. Therefore, we will review the evidence under the *Jackson* legal sufficiency standard and determine whether the evidence is sufficient to support the challenged elements beyond a reasonable doubt. *See id.*, *citing Jackson*, 443 U.S. at 319, 99 S.Ct. at 2789.

When reviewing the sufficiency of the evidence to support a criminal conviction, we view the evidence in the light most favorable to the verdict to determine whether, based on that evidence and reasonable inferences therefrom, a rational juror could have found the essential elements of the offense beyond a reasonable doubt. *Gear v. State*, 340 S.W.3d 743, 746 (Tex.Crim.App. 2011), *citing Jackson v. Virginia*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007)(quoting same); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex.Crim.App. 2007)(same).

Under a legal sufficiency review, we may not substitute our judgment for that of the jury, who is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the evidence. *Williams v. State*, 235 S.W.3d 742, 750 (Tex.Crim.App. 2007). We therefore defer to the jury's resolution of these issues and to its responsibility to draw reasonable inferences

21

from basic facts to ultimate facts.   *Hooper*, 214 S.W.3d at 13, *citing Jackson*, 443 U.S. at 318-19, 99 S.Ct. at 2788-89.   In resolving what the facts are and what reasonable inferences may be drawn from them, the jury may accept one version of the facts and reject another, and it may reject any part of a witness's testimony, even if uncontradicted.   *See Margraves v. State*, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000), *overruled on other grounds*, *Laster v. State*, 275 S.W.3d 512 (Tex.Crim.App. 2009); *Lancon v. State*, 253 S.W.3d 699, 707 (Tex.Crim.App. 2008)("The jury is the sole judge of a witness's credibility, and the weight to be given the testimony, it may choose to believe some testimony and disbelieve other testimony.").   In analyzing legal sufficiency, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Clayton*, 235 S.W.3d at 778, citing *Hooper*, 214 S.W.3d at 16-17.

Our review of "all of the evidence" includes evidence that was properly and improperly admitted.   *Clayton*, 235 S.W.3d at 778.   When the record supports conflicting inferences, we presume that the fact finder resolved the conflicts in favor of the prosecution and therefore defer to that determination.   *Id.*   Direct and circumstantial evidence are treated equally:   "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."   *Hooper*, 214 S.W.3d at 13.

Accomplice witness testimony can be sufficient to support a conviction under the *Jackson* legal sufficiency standard.   *See Taylor v. State*, 10 S.W.3d 673, 684-85 (Tex.Crim.App. 2000); *see also Powell v. State*, 194 S.W.3d 503, 507 (Tex.Crim.App. 2006)("[A] reviewing court is permitted to consider all evidence in the trial-court record, whether admissible or inadmissible, when making a legal-sufficiency determination."); *McDuff v. State*, 939 S.W.2d 607, 614

(Tex.Crim.App. 1997), *cert. denied*, 522 U.S. 844, 118 S.Ct. 125, 139 L.Ed.2d 75 (1997)(accomplice testimony need not be corroborated to be legally sufficient to show *corpus delicti*); *see also Cathey*, 992 S.W.2d at 462-63 ("The accomplice witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards.").

An element of a crime is the identity of the defendant as the individual who actually committed the offense. *Greene v. State,* 124 S.W.3d 789, 792 (Tex.App.--Houston [1st Dist.] 2003, pet. ref'd)(holding identity is an element of the offense which may be proven by direct or circumstantial evidence). An in-court identification of a defendant, in which the victim had observed for only fifteen minutes during an aggravated robbery is legally sufficient to support a conviction. *Johnson v. State,* 176 S.W.3d 74, 77-8 (Tex.App.--Houston [1st Dist.] 2004, pet. ref'd).

Any conduct on the part of a person accused of a crime, subsequent to its commission, which indicates a consciousness of guilt may be received as a circumstance tending to prove that he committed the act with which he is charged. *Cueva v. State*, 339 S.W.3d 839, 881-82 (Tex.App.--Corpus Christi 2011, pet. ref'd). Further, any evidence of a defendant's attempt to persuade a witness to modify their potential testimony or suppress it altogether shows a consciousness of guilt. *Brown v. State,* 657 S.W.2d 117, 119 (Tex.Crim.App. 1983); *Johnson v. State,* 583 S.W.2d 399, 409 (Tex.CrimApp. 1979). Such evidence can be considered circumstantial evidence indicating consciousness of guilt on the part of the accused. *See Cueva*, 339 S.W.3d at 882; *King v. State*, 29 S.W.3d 556, 565 (Tex.Crim.App. 2000)(noting that consciousness of guilt was included in evidence supporting legally sufficient evidence to support

23

connection to crime). More importantly, "[a] 'consciousness of guilt' is perhaps one of the strongest kinds of evidence of guilt." *Torres v. State,* 794 S.W.2d 596, 598 (Tex.App.--Austin 1990, no pet.).

## Sufficiency of the Evidence

We now turn to the sufficiency of the evidence and, in doing so, consider all of the evidence presented, including the accomplice witness's testimony. *Clayton*, 235 S.W.3d at 778; *Powell*, 194 S.W.3d at 507. We will look at all of the evidence presented as it relates to each count of the indictment which Sandoval was found guilty.

## Proof of Solicitation

Lopez, Martin, and Renovato's extensive testimony of the content of the innumerable cell phone conversations with Sandoval supports the jury's conclusion that Sandoval solicited Lopez to commit capital murder. Moreover, Lopez identified Sandoval, in court, as the individual who asked him to change his statement when they were together in jail. Lopez stated Sandoval asked him to kidnap Auralila, hold her until he returned so he could murder her, kill Auralila's mother and Rosete. In return, Sandoval offered Lopez $50,000 dollars and the option to take whatever Lopez wanted of Auralila's property. Lopez stated he agreed to Sandoval's proposal for the money.

The Wal-Mart videos show that Lopez, Martin, and Renovato acted upon the inducement of Sandoval. They purchased the necessary items to kidnap Auralila, kill her mother and Rosete. Rosete testified Lopez had followed him and gone to Rosete's home. This is further evidence that would allow a jury to conclude that Lopez was solicited by Sandoval.

The cell phone records corroborate the three accomplice witnesses' testimony of the

24

approximately 290 calls between Lopez and Sandoval from April 4, 2010 at 5:24 p.m. until April 5, 2010 at 8:26 p.m. Those records also corroborate Lopez' testimony that until April 4, there had been no calls between Sandoval and Lopez. Sandoval's cell phone calls also correspond to the Landstar packets with gas receipts of his travel to and from Michigan.

A jury could have reasonably inferred from this testimony that Sandoval was the person communicating with Lopez on April 4-5, 2010. Sandoval with the intent to kill Auralila, her mother, and Rosete, induced Lopez to hold Auralila so Sandoval could murder her, kill her mother, and Rosete. Sandoval, with the intent that a capital murder be committed, acted to induce Lopez to engage in the conduct to commit the capital murder, thus the criminal solicitation offense had been committed.

### Count I – Auralila Brenes

Sandoval initially offered Lopez $200 to check on Auralila Brenes who lived on Mike Godwin street and see what she was doing. Lopez did so, reporting to Sandoval that he saw Auralila moving furniture and a safe into a Budget moving truck. Auralila was being helped by her mother and her neighbors, Rosete and his wife. Sandoval offered Lopez $500 to follow Auralila and find out where she was moving, as Sandoval claimed the safe contained $250,000 in drugs and money. Sandoval also thought Auralila was cheating on him. Lopez tried following Auralila, but lost her and then he followed the Budget truck.

Rosete corroborates that as he was driving the Budget truck, he was followed by a blue car which he identified at trial as the one that followed him. Then, Sandoval offered Lopez up to $50,000 if Lopez would kidnap Auralila, murder Auralila' mother by chopping off her head, and hold Auralila until Sandoval could kill her. Lopez accepted the offer and enlisted Martin,

25

Renovato, and Jordan to assist him.

Considering the non-accomplice and accomplice testimony and evidence, viewed in the light most favorable to the verdict, the evidence was legally sufficient to support Sandoval's conviction on Count I of the indictment. *Gear*, 340 S.W.3d at 746.

### Count II – Francisca Garcia

As noted, Sandoval told Lopez he would pay him $10,000 if Lopez would kidnap Auralila and murder Garcia, Auralila's mother, by chopping off her head. Sandoval allegedly believed that Auralila's mother put a hex on him, which is why he wanted her head chopped off. Security video from a Wal-Mart showed Lopez and his fellow gang members purchasing a machete in order to perform this task. Viewed in the light most favorable to the verdict, the evidence was legally sufficient to support Sandoval's conviction on Count II of the indictment, that Sandoval solicited Lopez with the promise of remuneration to kill Francisca Garcia. *Gear*, 340 S.W.3d at 746.

### Count III – Flavio Rosete

Sandoval was informed that Rosete was assisting Auralila's move by Lopez. When the attempts to locate Auralila were unsuccessful, Sandoval told Lopez to break into Rosete's house and "do whatever needs to be done" to get him to say where Auralila had moved to. If Rosete could not help, he was to be killed as well. Lopez and Martin attempted to execute these instructions by going to Rosete's house, but no one answered when they knocked. Rosete testified that he saw Lopez' car drive by his house and refused to answer the door.

Considering Rosete's and the accomplice witnesses' testimony and evidence, viewed in the light most favorable to the verdict, the evidence was legally sufficient to support Sandoval's conviction on Count III of the indictment, soliciting Lopez with the promise of remuneration to kill

26

Rosete if he failed to provide Auralila's location.   *Gear*, 340 S.W.3d at 746.

## Consciousness of Guilt

Following Sandoval's arrest, he approached Lopez in the El Paso County Jail and asked Lopez to change his statements in which Lopez had incriminated Sandoval and themselves. Sandoval told Lopez to change his statement to say that Lopez "had made up the story."   Sandoval promised Lopez the charges would be dropped if Lopez changed his story.   Sandoval asked Martin not to say that they were "going to go kill everybody," and they "should just have been quiet."   He instructed Martin not to take the deal the prosecutor had offered him.

While at the El Paso County Jail, Sandoval repeatedly attempted to speak with Renovato. Eventually, Sandoval told Renovato to write a letter, telling him if he writes it, "I'm pretty sure that the D.A. isn't going to have anything else against you guys, or any of us."   Sandoval reassured Renovato if he wrote the letter that "I'm pretty sure I can get you off for all of this . . . ."   Renovato asked Sandoval what to write.   Sandoval told him, "you had a misunderstanding in what was supposed to really happen."   Sandoval gave Renovato paper and pen.   Renovato wrote the letter, signed it and gave it to Sandoval while they were in jail together.   In the letter, Renovato stated that "[e]verything . . . [in my case] has been a lie . . . ."   Renovato admitted the letter is what Sandoval told him to write.   Sandoval also requested Renovato obtain similar statements from Martin and Jordan.   Renovato's original letter was introduced at trial by Sandoval.

Viewing all of the evidence in the light most favorable to the verdict, a rational jury could reasonably conclude that Sandoval was guilty of the charged offenses.   *Gear*, 340 S.W.3d at 746. Sandoval's sole issue is overruled.

## Judgment

27

We have reviewed the judgment entered by the trial court and find it requires reformation. Article 37.12 requires the trial court to enter a proper judgment on **each verdict** of acquittal or conviction. TEX.CODE CRIM.PROC.ANN. art. 37.12 (West 2006). Further, Article 42.01 requires that the judgment reflect "[t]he offense or offenses for which the defendant was convicted." TEX.CODE CRIM.PROC.ANN. art. 42.01, § 1(13)(West Supp. 2012). If a defendant receives multiple convictions in a single trial, those verdicts may be memorialized in multiple judgments. *Morales v. State*, 974 S.W.2d 191, 192 (Tex.App.--San Antonio 1998, no pet.). Article 42.01 permits a court enter a single judgment reflecting multiple convictions, but the judgment must clearly reflect the jury verdict on each count and the offenses, as well as the sentence imposed for each conviction.

The jury found Sandoval guilty of Counts I, II, and III and acquitted him of Count IV. The State dismissed Count V. At the top of the first page of the judgment, the judgment identifies the cause number and refers to "Counts I - IV of V." The judgment is erroneous because it fails to reflect that Sandoval was acquitted of Count IV. The judgment is reformed to reflect Appellant was acquitted of Count IV. *See* TEX.R.APP.P. 43.2(b).

Other than the reference to "Counts I - IV of V" at the top of the first page, the judgment fails to reflect that the jury returned three separate guilty verdicts on Counts I, II, and III. Further, the judgment does not clearly reflect that Sandoval was convicted of three counts of criminal solicitation to commit capital murder. Under the heading, "Offense for which Defendant Convicted," the judgment states only "Criminal Solicitation (Capital Murder)." The judgment is therefore reformed to reflect that the jury returned a guilty verdict on each count (I, II, and III) and Sandoval was convicted of three counts of criminal solicitation to commit capital murder. *See*

28

Tex.Code Crim.Proc.Ann. art. 42.01, § 1(7), (13); Tex.R.App.P. 43.2(b).

The judgment reflects only a single sentence of imprisonment for a term of thirty years in TDCJ-ID even though the jury found Sandoval guilty of three counts. When an accused is found guilty of multiple offenses in a single criminal proceeding, the court must pronounce a sentence for each offence. *See* Tex.Penal Code Ann. § 3.03(a)(West Supp. 2012). Further, the sentence for each count must be reflected in the judgment. *See* Tex.Code Crim.Proc.Ann. art. 42.01, § 1(15). We therefore reform the judgment to reflect that the trial court sentenced Appellant to serve a thirty-year term of imprisonment on each count. Finally, the trial court's judgment does not reflect whether the sentences are to be served concurrently or consecutively. In this case, the sentences must run concurrently. *See* Tex.Penal Code Ann. § 3.03(a). We reform the judgment to reflect that the sentences for Counts I, II, and III will run concurrently. *See* Tex.Code Crim.Proc.Ann. art. 42.01, § 1(19). Having overruled each issue presented on appeal, we affirm the judgment as so modified.

October 30, 2013

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.

(Do Not Publish)

29